IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | No. CR-13-2250-TUC-CKJ (BGM) |
| Plaintiff, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| vs. | ) | |
| | ) | |
| Jeremy Lee Garcia, | ) | |
| Defendant. | ) | |
| | ) | |

Currently pending before the Court is Defendant Jeremy Lee Garcia's Motion to Suppress (Doc. 16). Defendant is charged with one count of knowingly and intentionally possessing with intent to distribute 50 kilograms or more of marijuana, a Schedule 1 controlled substance; in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). Indictment (Doc. 9). Defendant seeks suppression of evidence obtained as a result of a search allegedly in violation of the Fourth Amendment. The Government argues that it lawfully stopped Defendant's vehicle at a Border Patrol checkpoint, referred the vehicle to secondary, and obtained consent to search the back of the vehicle, including the luggage contained therein.

Pursuant to LRCrim. 5.1, this matter came before Magistrate Judge Macdonald for an evidentiary hearing and a report and recommendation. On March 4, 2014, oral argument was heard by Magistrate Judge Macdonald and the matter taken under advisement. Minute Entry 3/5/2014 (Doc. 27). The Magistrate Judge recommends that the District Court, after its independent review, deny Defendant's motion.

. . .

. . .

**I.     FACTUAL BACKGROUND**

On November 26, 2013, at approximately 10:30 a.m., United States Border Patrol Agent Zane Avalos was working primary inspection at the permanent immigration checkpoint located on State Route 85. Hr'g Tr. 3/5/2014 (Doc. 29) 8:25-13:2. Agent Avalos has been a Border Patrol Agent for nearly four (4) years. *Id.* at 8:9-18. Agent Avalos testified that the State Route 85 checkpoint has been in operation at least two and one half years full time, and prior to that it was a tactical checkpoint. *Id.* at 10:25-11:4. Agent Avalos further testified that the checkpoint has always been located at Mile Marker 58. *Id.* at 11:5-6.

The State Route 85 checkpoint is approximately twenty-two (22) miles from the United States/Mexican border. *Id.* at 9:25-10:1. Agent Avalos testified that it is marked with signage that states United States Border Patrol, as well as other signs that say "checkpoint ahead" and "U.S. agents ahead." Hr'g Tr. 3/5/2014 (Doc. 29) at 11:7-13. The checkpoint is also marked with cones, stop signs, and a shade canopy. *Id.* 11:7-13. The signs notifying motorists of a checkpoint ahead are located several hundred yards away from the actual checkpoint, as are reduced speed limit signs. *Id.* at 11:17-23. The checkpoint is normally staffed with a minimum of three (3) border patrol agents. *Id.* at 13:4-8.

Agent Avalos testified that on the morning in question, there were only two (2) agents staffing the State Route 85 checkpoint. *Id.* at 13:9-17. Agent Avalos further testified that while he was working the primary inspection point, at approximately 10:30 a.m., a blue 1998 Jeep Cherokee approached the checkpoint. Hr'g Tr. 3/5/2014 (Doc. 29) at 12:19-13:2, 13:21-23. Defendant Jeremy Garcia also testified that Agent Avalos was at the primary inspection point when he approached the State Route 85 checkpoint. *Id.* at 47:12-26. Agent Avalos testified that Defendant had his window down and music on as he approached the checkpoint. *Id.* at 13:24-14:6. Agent Avalos further testified that Defendant, upon reaching the primary inspection point, turned his music off, and Agent Avalos enquired where he was

coming from.[1]  *Id.*  Defendant testified that Agent Avalos's initial questioning was in Spanish, but Defendant did not understand the questions because he is an English speaker; however, Agent Avalos testified that his initial inquiry occurred in English.  *Id.* at 48:4-18, 45:18-22.  Defendant responded that he was coming from Sonoyta, Mexico.  Hr'g Tr. 3/5/2014 (Doc. 29) at 48:4-18.  Agent Avalos testified that he asked Defendant how long he had been in Sonoyta, to which Defendant responded about a week.  *Id.* at 14:7-10.  Defendant also testified that Agent Avalos had questioned him where he was coming from, and that he had responded that he had been in Sonoyta for about a week.  *Id.* at 61:7-62:21.  Agent Avalos testified that he then asked Defendant for identification.  *Id.* at 14:7-10.  Agent Avalos testified that Defendant appeared semi-nervous during their initial encounter, shifting his gaze back and forth between the road and Agent Avalos.  *Id.* at 14:11-21.

Agent Avalos testified that while he was asking Defendant his initial question, he did "a quick walk of the vehicle."  Hr'g Tr. 3/5/2014 (Doc. 29) at 13:24-14:6.  Agent Avalos further testified that during this time he saw two large pieces of luggage, as well as a small duffle bag in the rear compartment.  *Id.* at 13:24-14:6, 31:3-9.  Defendant also testified that there were three (3) pieces of luggage in the car that he was driving.  *Id.* at 59:22-24, 60:6-8.  Agent Avalos testified that although the windows were lightly tinted, he had a clear view of the luggage within Defendant's vehicle.  *Id.* at 14:25-15:5.  Defendant also testified that the tinting on his rear windows was light.  *Id.* at 63:19-25.  Agent Avalos further testified describing the luggage as a red duffle bag on the driver's side which appeared full, and squared-off in shape; a two-by-three piece of luggage in the middle which appeared slightly dusty; and then an open duffle bag which appeared full of laundry and was slightly open in the corner.  Hr'g Tr. 3/5/2014 (Doc. 29) at 15:6-16.  Agent Avalos testified that the red duffle bag raised his suspicions because of its angular appearance, which was consistent with other cases he has been involved with regarding checkpoint marijuana smuggling loads.  *Id.* at

---

[1]Defendant initially testified that Agent Avalos did not ask him whether or not he was an American citizen, but then testified that Agent Avalos's first question was whether or not he was a citizen.  Hr'g Tr. 3/5/2014 (Doc. 29) at 48:22-49:14.

15:23-16:24, 40:21-41:2.  Agent Avalos further testified that the middle piece of luggage appeared dusty and old, which he found consistent with luggage that has been transported across the border through the desert prior to being loaded into a vehicle along Highway 85. *Id.* at 16:25-18:5.

Agent Avalos also testified that he observed a gray flip-phone on Defendant's front-passenger seat.[2]  *Id.* at 18:9-26, 39:10-40:5, 44:3-23.  Agent Avalos further testified that the phone appeared to be a type of prepaid cellular phone by Verizon that is commonly used in smuggling operations.  *Id.*  Defendant testified that the phone was a Verizon phone which he had owned for a couple of weeks.  Hr'g Tr. 3/5/2014 (Doc. 29) at 49:26-50:5.

Agent Avalos testified that based on Defendant's behavior, the luggage in the rear of his vehicle, the gray flip-phone, and Defendant's statement that he had spent a week in Sonoyta, Mexico raised his suspicions.  *Id.* at 18:9-19:18.  Agent Avalos further testified that Sonoyta, Mexico is a small town, that he understands is "more of a pass-through town, smaller community, that's not really, generally, for tourism."  *Id.*  Additionally, Agent Avalos testified that the amount of luggage Defendant was transporting seemed excessive for one individual visiting Sonoyta for a week.  *Id.*

Agent Avalos asked Defendant for identification, was provided an Arizona driver's license, at which point Agent Avalos referred Defendant to secondary.[3]  *Id.* at 19:23-20:19. Defendant also testified that Agent Avalos requested his identification prior to referral to secondary.  Hr'g Tr. 3/5/2014 (Doc. 29) at 50:13–51:2, 65:7-9.  Agent Avalos further

---

[2]Defendant testified that his phone was in his lap.  Hr'g Tr. 3/5/2014 (Doc. 29) at 49:24-25.

[3]During cross-examination of Agent Avalos, defense counsel questioned the agent regarding inconsistencies between his in court testimony and his written report.  *See* Hr'g Tr. 3/5/2014 (Doc. 29) at 27:6-30:22.  Irrespective of whether Agent Avalos obtained Defendant's driver's license prior to walking along performing a visual inspection of Defendant's vehicle or after, Agent Avalos testified consistently that he obtained Defendant's Arizona driver's license prior to referring him to secondary.  *Id.* at 19:23-20:19, 27:6-30:22, 43:7-44:2.

1    testified that when Defendant pulled out his identification, his hands were a little shaky.  *Id.*

2    at 44:24-45:6.  Agent Avalos testified that at the time he referred Defendant to secondary,

3    Agent Avalos was suspicious regarding a possible narcotics violation.  *Id.* at 20:11-19, 21:11-

4    22:5, 41:14-19.  Agent Avalos testified that his questioning of Defendant at the primary

5    inspection stop lasted less than two minutes.  *Id.* at 19:26-20:7.

6         Agent Avalos testified that the State Route 85 immigration checkpoint's secondary

7    inspection area is approximately twenty (20) yards away from the primary inspection

8    location.  *Id.* at 22:21-26.  Furthermore, the secondary inspection area is in full view of the

9    public.  Hr'g Tr. 3/5/2014 (Doc. 29) at 22:21-23:8.  Agent Avalos testified that once

10   Defendant had pulled into the secondary inspection area, Agent Avalos approached and

11   asked if he could look in the back of Defendant's vehicle and open his luggage.  *Id.* at 23:9-

12   16, 26:10-17, 42:2-23.  Agent Avalos further testified that Defendant answered his question

13   in the affirmative.  *Id.* at 23:17-18, 26:21-22.  Agent Avalos testified that he then accessed

14   the back of Defendant's vehicle through the rear handle and lift-gate.  *Id.* 24:3-6.  Agent

15   Avalos further testified that once he opened the lift-gate, he "did a quick unzip" of the red

16   duffel bag that appeared square.  *Id.* at 24:7-18.  Agent Avalos testified that Defendant did

17   not object to Agent Avalos's inspection of the bags as it was happening.  Hr'g Tr. 3/5/2014

18   (Doc. 29) at 24:19-24, 25:9-15.  Agent Avalos further testified that upon opening the red bag,

19   he saw the cellophane-wrapped packages and immediately placed Defendant under arrest.

20   *Id.* at 25:3-8.  Agent Avalos testified that the entire encounter lasted approximately three (3)

21   or four (4) minutes.  *Id.* at 25:19-26:2.  Defendant also testified that the entire stop lasted

22   approximately three (3) minutes.  *Id.* at 57:26-58:6.  Agent Avalos did not have Defendant

23   fill out a form regarding consent for searching.  *Id.* at 41:22-42:1.

24        Defendant testified that upon his arrival in the secondary inspection area, Agent

25   Avalos asked "can I search your vehicle."  Hr'g Tr. 3/5/2014 (Doc. 29) at 51:17-22, 68:2-6,

26   20-22.  Defendant further testified that he responded "yes."  *Id.* at 51:23-24, 68:2-6, 20-22.

27   Defendant testified that Agent Avalos then "came back around again" and asked him a

28   second question for permission to search Defendant's luggage, to which he responded "no."

1   *Id.* at 51:25-52:7, 68:7-13, 68:23-69:2.  Defendant testified that during his time in secondary

2   he remained in his vehicle, and turned his vehicle off.  *Id.* 66:3-25.  Defendant turned off his

3   vehicle without being asked.  *Id.*  Defendant further testified that despite having told Agent

4   Avalos that he could not search Defendant's luggage, Defendant ceased to pay attention to

5   what the agent was doing at the back of his vehicle.  Hr'g Tr. 3/5/2014 (Doc. 29) at 69:3-12.

6   Defendant testified that he did not protest at any time about the search of his luggage.  *Id.* at

7   70:8-12.  Defendant further testified that although he is facing a felony charge in this case

8   he does not want it thrown out.  *Id.* at 56:4-14.

9

10  **II.    ANALYSIS**

11      Defendant contests his "seizure" unsupported by "reasonable suspicion" in being

12  directed to the secondary inspection area of the State Route 85 immigration checkpoint and

13  the warrantless search of his luggage without his consent.  Def.'s Mot. to Suppress (Doc. 43)

14  at 3, 5-6.

15          **A.    *Referral to Secondary at Immigration Checkpoint***

16      "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the

17  Government, and its protections extend to brief investigatory stops of persons or vehicles that

18  fall short of traditional arrest."  *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744,

19  750, 151 L.Ed.2d 740 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d

20  889 (1968)); *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621

21  (1981)).  "[C]heckpoint stops are 'seizures' within the meaning of the Fourth Amendment."

22  *Martinez-Fuerte v. United States*, 428 U.S. 543, 556, 96 S.Ct. 3074, 3082, 49 L.Ed.2d 1116

23  (1976).  The Supreme Court of the United States has "upheld brief, suspicionless seizures of

24  motorists at a fixed Border Patrol checkpoint designed to intercept illegal aliens, . . . and at

25  a sobriety checkpoint aimed at removing drunk drivers from the road[.]"  *City of Indianapolis

26  v. Edmond*, 531 U.S. 32, 37, 121 S.Ct. 447, 452, 148 L.Ed.2d 333 (2000) (internal citations

27  omitted).  Such programs were "designed to serve 'special needs, beyond the normal need

28  for law enforcement.'"  *Id.* (citations omitted).  Moreover, "[i]t has been a national policy for

1   many years to limit immigration into the United States." *Martinez-Fuerte*, 428 U.S. at 551,

2   96 S.Ct. at 3080. There is a substantial public interest "in the practice of routine stops for

3   inquiry at permanent checkpoints." *Id.* at 556, 96 S.Ct. at 3082.

4   "While the need to make routine checkpoint stops is great, the consequent intrusion

5   on Fourth Amendment interests is quite limited." *Id.* at 558, 96 S.Ct. at 3083. The severity

6   of the interference with individual liberty "is 'gauged by the objective intrusion, measured

7   by the duration of the seizure and the intensity of the investigation, and by the subjective

8   intrusion measured by the fear and surprise engendered in law-abiding motorists by the

9   nature of the stop." *United States v. Fraire*, 575 F.3d 929, 934 (9th Cir. 2009) (citations

10  omitted). "Such a stop is reasonable per se, so long as the scope of the detention remains

11  confined to a few brief questions, the possible production of a document indicating the

12  detainee's lawful presence in the United States, and a 'visual inspection of the vehicle . . .

13  limited to what can be seen without a search.'" *United States v. Taylor*, 934 F.2d 218, 220

14  (9th Cir. 1991) (quoting *Martinez-Fuerte*, 428 U.S. at 558, 562, 96 S.Ct. at 3083, 3085).

15  "[A] vehicle [may, however,] be stopped at 'reasonably located checkpoints,' . . . for

16  brief initial questioning and referred to a secondary inspection area for further brief

17  questioning 'in the absence of any individualized suspicion . . . .'" *United States v. Barnett*,

18  935 F.2d 178 (9th Cir. 1991) (quoting *Martinez-Fuerte*, 428 U.S. at 562, 96 S.Ct. at 3805).

19  Moreover, the Ninth Circuit Court of Appeals has "held that *Martinez-Fuerte* 'does not

20  mandate an inquiry into the subjective purpose of the agent making referrals to secondary

21  inspection, unless there is some objective evidence supporting the charge of pretext." *United*

22  *States v. Koshnevis*, 979 F.2d 691, 694 (9th Cir. 1992); *see also United States v. Wilson*, 7

23  F.3d 828, 833 (9th Cir. 1993) (same). As such, "[i]n the absence of affirmative evidence that

24  [an agent] harbored a subjective purpose in referring [a defendant] to secondary inspection

25  for drug-related offenses, we will not require an agent to demonstrate articulable suspicion

26  for an otherwise legitimate immigration stop." *Id.* If the brief further detention at an

27  immigration checkpoint is for reasons unrelated to immigration, the Government bears the

28  burden to show that "the brief further detention . . . [is] predicated on an articulable suspicion

1   or 'a minimal showing of suspicion,' . . . of criminal activity." *Taylor*, 934 F.2d at 221

2   (citations omitted); *see also Wilson*, 7 F.3d at 834; *United States v. Bowers*, 967 F.2d 592

3   (9th Cir. 1992).

4          Here, the parties agree that the permanent immigration checkpoint on State Route 85

5   is constitutional. *See* Hr'g Tr. 3/5/2014 (Doc. 29) at 72:4-9, 77:7-13. Furthermore, the initial

6   stop was brief and included only a few questions. *Id.* at 19:26-20:7. The Defendant,

7   however, has met his burden to show that Agent Avalos's referral of Defendant to secondary

8   was not for immigration purposes. *Id.* at 20:11-19, 21:11-22:5, 41:14-19. As such, the

9   burden shifts to the Government to demonstrate that Agent Avalos had an articulable

10   suspicion that criminal activity was afoot prior to referring Defendant to secondary. *See*

11   *Taylor*, 934 F.2d at 221; *see also Wilson*, 7 F.3d at 834. The Court finds that the Government

12   has met its burden.

13          Agent Avalos testified that based on Defendant's semi-nervous appearance, shifting

14   his gaze back and forth between the road and Agent Avalos; luggage in the rear of the

15   vehicle, including a red duffle bag that appeared full and squared off in shape and a large,

16   older suitcase that appeared dusty, which was consistent with luggage that had been

17   transported through the desert prior being loaded into a vehicle along Highway 85; a gray

18   flip-phone that appeared to be a Verizon prepaid cellular telephone commonly used in

19   smuggling operations; Defendant's statement that he had spent a week in Sonoyta, Mexico,

20   which is not a known tourist destination, as well as the seemingly excessive amount of

21   luggage that Defendant was carrying for a one week trip; and Defendant's shaky hands when

22   he removed his identification from his wallet, Agent Avalos became suspicious that a

23   possible narcotics violation was in progress. Hr'g Tr. 3/5/2014 (Doc. 29) at 14:11-21, 15:6-

24   18:5, 18:9-19:18, 20:11-19, 21:11-22:5, 39:10-40:5, 40:21-41:2, 41:14-19, 44:3-45:6. The

25   Court finds Agent Avalos credible regarding his reasons for becoming suspicious that

26   Defendant was possibly involved in criminal activity.

27          When making a reasonable-suspicion determination, the reviewing court "must look

28   at the 'totality of the circumstances' of each case to see whether the detaining officer has a

1   'particularized and objective basis' for suspecting legal wrongdoing." *United States v.*

2   *Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002) (citations omitted).

3   In so doing, officers are allowed "to draw on their own experience and specialized training

4   to make inferences from and deductions about the cumulative information available to them

5   that 'might well elude an untrained person.'" *Id.* at 273, 122 S.Ct. at 750-51. (citations

6   omitted).  Based upon all the factors that he observed, Agent Avalos suspected narcotics

7   activity.  Hr'g Tr. 3/5/2014 (Doc. 29) at 20:11-19, 21:11-22:5, 41:14-19.  Defendant argues

8   how each piece of evidence independently is innocent, or applies to most of the population.

9   *Id.* at 78:1-79:24.  What may seem to be innocuous conduct when viewed in isolation,

10  however, may be appropriately considered when considering the totality of the

11  circumstances; thus, it is inappropriate to view factors in isolation and to give no weight to

12  factors which may have an innocent explanation.  *Arvizu*, 534 U.S. at 273-75,  122 S.Ct. at

13  750-51.  Based upon all the factors, and in his own experience, Agent Avalos suspected

14  Defendant was involved in narcotics trafficking and referred him to secondary.  The Court

15  finds that the totality of the circumstances supports a finding that Agent Avalos had a

16  reasonable suspicion that criminal activity was afoot.

17  ## B.   Consent

18  It is well settled law "that one of the specifically established exceptions to the

19  requirements of both a warrant and probable cause is a search that is conducted pursuant to

20  consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043-44, 36

21  L.Ed.2d 854 (1973).  "[T]he Fourth and Fourteenth amendments require that a consent not

22  be coerced, by explicit or implicit means, by implied threat or covert force.  For, no matter

23  how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext

24  for the unjustified police intrusion against which the Fourth Amendment is directed." *Id.* at

25  228, 93 S.Ct. at 2048.

26  "Arrests or searches at immigration checkpoints must be justified by either probable

27  cause or consent." *United States v. Preciado-Robles*, 964 F.2d 882,884 (9th Cir. 1992)

28  (citing *Martinez-Fuerte*, 428 U.S. at 567, 96 S.Ct. at 3087.  "Whether consent to search was

voluntarily given is 'to be determined from the totality of all the circumstances.'" *United States v. Patayan Soriano*, 361 F.3d 494, 501 (9th Cir. 2004) (quoting *Schneckloth*, 412 U.S. at 222, 93 S.Ct. at 2041).   "[F]ive factors are to be considered in determining the voluntariness of consent to a search[;]" however, these factors are guideposts, and should not be considered a checklist for the Court's review.  *Patayan Soriano*, 361 F.3d at 502.  The five factors are as follows: "(1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the defendant was notified that [he] had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained."  *Patayan Soriano*, 361 F.3d at 502 (quoting *United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002)).   "The fact that some of these factors are not established does not automatically mean that consent was not voluntary." *United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1988).  The Government bears "the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. State of North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968).

Here, Defendant testified that once he moved his vehicle to the secondary inspection area, he turned his car off and remained in his vehicle.  Hr'g Tr. 3/5/2014 (Doc. 29) at 66:3-25.  Defendant turned off his ignition without being asked. *Id.*  Defendant remained in his vehicle during the search. *Id.*  As such, the Court finds that Defendant was not in custody during the stop at secondary.  There is no evidence that Agent Avalos had his gun drawn at any time during the encounter with Defendant.  There is no evidence that *Miranda* warnings were given, or necessary, prior to or during the search at secondary.  Defendant was not told that he had a right not to consent or that a search warrant could be obtained.

Agent Avalos requested permission to search the rear of the vehicle and the luggage. *Id.* at 23:9-16, 26:10-17, 42:2-23.  It is undisputed that Agent Avalos was able to see the luggage in the rear of Defendant's vehicle through the window. *Id.* at 14:25-15:5, 63:19-25. The Court finds that Agent Avalos's testimony was more credible regarding his request for permission.  Defendant's version that Agent Avalos first asked him for permission to search the rear of the vehicle, and then later for permission to search the luggage is not credible.

Agent Avalos could already see the luggage, Defendant's testimony that Agent Avalos would "forget" to ask for permission to search the luggage, and have to "come back around again" to request permission to search it does not make sense. *See* Hr'g Tr. 3/5/2014 (Doc. 29) at 51:25-52:7, 68:7-13, 68:23-69:2. As such, the Court finds that Agent Avalos requested permission to search the rear of the vehicle and the luggage, and Defendant consented to the search.

## III.   CONCLUSION

Agent Avalos, based upon the totality of the circumstances, possessed reasonable suspicion that criminal activity may be afoot. *See Sokolow*, 490 U.S. at 7, 109 S.Ct. at 1585. As such, his referral of the blue 1998 Jeep Cherokee driven by Defendant Garcia to the secondary inspection area of the State Route 85 immigration checkpoint did not violate the Fourth Amendment. Further, Defendant Garcia consented to the search of his vehicle and luggage.

## IV.   RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Court deny Defendant Jeremy Lee Garcia's Motion to Suppress (Doc. 16).

Pursuant to 28 U.S.C. §636(b) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. A party may respond to another party's objections within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b)(2). No reply shall be filed unless leave is granted from the District Court. If objections are filed, the parties should use the following case number: **CR-13-2250-TUC-CKJ**.

. . .

. . .

. . .

1       Failure to file timely objections to any factual or legal determination of the

2  Magistrate Judge in accordance with Fed. R. Crim. P. 59 may result in waiver of the right

3  of review.

4       DATED this 20th day of March, 2014.

Bruce G. Macdonald
United States Magistrate Judge

- 12 -